**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Whitaker,<br><br>    Plaintiff,<br><br>vs.<br><br>Carolyn W. Colvin,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | No. CV-12-0204-TUC-BGM<br><br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 21). Defendant filed her response (Doc. 25), and Plaintiff replied (Doc. 26). Also pending is Plaintiff's Motion to Withdraw as Attorney of Record and Preliminary Notice of Substitution of Counsel (Doc. 28). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. The Court takes judicial notice that Michael J. Astrue is no longer Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Acting Commissioner of the SSA, Carolyn W. Colvin, as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

. . .

. . .

. . .

**I.   BACKGROUND**

   *A.   Procedural History*

On September 23, 2009, Plaintiff filed an application for Supplemental Security Income ("SSI") alleging disability as of January 1, 2004 due to a damaged right knee, bipolar disorder, attention deficit hyperactivity disorder (ADHD), and alcohol dependence.[1]  *See* Administrative Record ("AR") at 20, 22, 41, 87, 166, 172, 213.  The Social Security Administration ("SSA") denied this application on January 28, 2010.  *Id.* at 107.  On April 5, 2010, Plaintiff filed a request for reconsideration, and on August 24, 2010, SSA denied Plaintiff's request.  *Id*. at 111-13.  On October 22, 2010, Plaintiff filed his request for hearing.  *Id.* at 118-20.  On June 6, 2011, a hearing was held before Administrative Law Judge ("ALJ") Lauren Mathon.  *Id*. at 39.  The ALJ issued an unfavorable decision on July 15, 2011.  AR at 20-33.  Plaintiff requested review of the ALJ's decision by the Appeals Council, and on January 18, 2012, review was denied.  *Id.* at 1-3.  On March 20, 2012, Plaintiff filed this cause of action.  Compl. (Doc. 1).

   *B.   Factual History*

Plaintiff was thirty-nine (39) years old at the time of the administrative hearing, and thirty-eight (38) at the time of the alleged onset of his disability.  AR at 45, 187, 208, 221, 240.  Plaintiff possesses a ninth grade education and reads at a fifth grade level.[2]  *Id.* at 48, 210, 555.  Prior to his alleged disability, Plaintiff worked as a landscaper.  *Id.* at 50, 192, 214.

At the administrative hearing, Plaintiff testified that he is currently homeless, and has been for approximately three (3) months.  *Id.* at 46-47.  Plaintiff further testified that he had been living at the Gospel Rescue Mission and then the Hospitality House; however, Plaintiff failed a breathalyzer test upon returning to the Hospitality House.  *Id.* at 47.  As a result, he

---

[1]At the hearing, Plaintiff amended his onset date of disability to November 1, 2010.  AR at 20, 43.

[2]There is conflicting evidence in the record regarding Plaintiff's highest grade of school completed.  At least one record indicates that Plaintiff has a fifth grade education.  AR at 196.

- 2 -

1 can no longer stay there. AR at 47.

2     Plaintiff testified that he has been looking for work either washing dishes or yard work
3 since his release from prison in October 2010. *Id.* at 50-51. Plaintiff further testified that he
4 feels the main thing preventing him from working is his ADHD. *Id.* at 52. Plaintiff also
5 testified that a knee injury affects his ability to work. *Id.* at 53. Plaintiff testified that he
6 sometimes has a problem getting along with people, because he has mood swings due to
7 bipolar disorder. *Id.* Plaintiff also testified that he has some numbness in the thumb and first
8 two digits of both hands. *Id.* at 62.

9     Plaintiff testified that he had "a beer after work" the previous Friday. AR at 56.
10 Plaintiff further testified that this is what he calls digging for aluminum cans. *Id.* Plaintiff
11 testified that his longest period of sobriety was during his five year incarceration.[3] *Id.* at 60.
12 Outside of prison, Plaintiff testified that the longest he has stayed sober is approximately
13 three (3) weeks. *Id.* Plaintiff testified that through La Frontera, he is receiving Acu-Detox,
14 acupuncture to help reduce alcohol cravings three (3) times per week. *Id.* at 55, 60. Plaintiff
15 testified that he does not have an Alcoholics Anonymous ("AA") sponsor. AR at 61.

16     Ms. Lydia Reynolds, a case manager at La Frontera, also testified at the administrative
17 hearing. *Id.* at 70. Ms. Reynolds testified that she sees Plaintiff at a minimum once per
18 week, but usually more. *Id.* Ms. Reynolds testified that she works for the Readily
19 Accessible People Program ("RAPP") at La Frontera, which provides assistance to
20 individuals with serious mental illness and who are homeless. *Id.* at 71. Ms. Reynolds
21 testified that she assists Plaintiff with obtaining entitlements, such as AHCCCS and food
22 stamps, and establishing medical care. *Id.* at 72. She also assists Plaintiff with obtaining
23 behavioral health and substance abuse counseling available at RAPP. AR at 73.

24     Ms. Reynolds testified having observed Plaintiff having a lot of mood swings and

---

[3]Plaintiff's prison records indicate that he failed a urine screen at least once during his incarceration. AR at 267.

- 3 -

1  ongoing anxiety, with difficulty concentrating and staying focused. *Id.* Ms. Reynolds further
2  testified that she has observed Plaintiff's behavioral issues both when he is sober and when
3  he is under the influence of alcohol. *Id.* at 75. Ms. Reynolds also testified that Plaintiff is
4  willing to do small jobs for pocket money, but opined that his symptoms would make it
5  difficult for him to sustain a work schedule. *Id.* at 76. Ms. Reynolds testified that she would
6  recommend a payee if Plaintiff were awarded benefits. *Id.* at 78.

7  Ms. Reynolds further testified that Plaintiff uses his pocket money to support his
8  nicotine and alcohol addictions. AR at 77. Ms. Reynolds also testified, that Plaintiff is
9  somewhat consistent in taking his prescribed medications, only missing a dose or two per
10 month. *Id.* at 78.

11 Plaintiff was incarcerated from July 2004 through June 2008. *Id.* at 254-73, 312.
12 During his incarceration Plaintiff was diagnosed with bipolar disorder and ADHD. *Id.* at
13 254, 255, 264, 271. Plaintiff was on lockdown on January 28, 2007. *Id.* at 257. Plaintiff's
14 medical records indicate that on March 1, 2007, he was seen in medical after an altercation
15 with the dentist. AR at 271. At that time the records indicate Plaintiff was refusing his
16 medications. *Id.* On April 6, 2006, consulting psychiatrist, Laurence Schiff, M.D., assessed
17 Plaintiff and gave "him the okay for light duty, and a long sleeve shirt." *Id.* at 270. On April
18 10, 2007, Plaintiff requested to see his previous therapist. *Id.* at 271. On August 13, 2007,
19 Plaintiff was seen and the records indicate that he had been off all medications for seven (7)
20 months. *Id.* at 269. On August 16, 2007, Dr. Schiff again wrote a letter after evaluating
21 Plaintiff, stating that it "is appropriate [for him] to be excused from participating in
22 department programs[.]" AR at 268. On September 14, 2007, Dr. Schiff stated that Plaintiff
23 was capable of working at an outside job, but not one that required travel. *Id.* at 266. On
24 November 27, 2007, Dr. Schiff rescinded his prior excusal because Plaintiff had a positive
25 urine drug screen. *Id.* at 267. On November 28, 2007, Susan Jaeger, LPC, wrote a memo
26 noting Plaintiff's increased anxiety and non-compliance with medications as preventing him
27 from effective participation in department programs. *Id.* On December 10, 2007, Plaintiff
28

- 4 -

1  was seen and the progress note states that although medications were discussed, it was
2  ultimately decided that there were no medications that Plaintiff could tolerate. *Id.* at 263.
3        Upon release from prison, Plaintiff sought mental health treatment at Mohave Mental
4  Health Clinic. AR at 274-313; 345-411. He was diagnosed with bipolar disorder not
5  otherwise specified and alcohol dependence. *Id.* at 308. Through Mohave, Plaintiff began
6  taking medication for his bipolar disorder again. *Id.* at 345-411.
7        On October 8, 2008, Plaintiff failed to attend his Consultative Examination. *Id.* at
8  320. As such, Heather Barrons, Psy.D. had insufficient evidence upon which to make any
9  findings. *Id.* at 321. Consultative examiner Stephen D. Bailey also found insufficient
10 evidence upon which to make any findings. AR at 506-19.
11       On June 23, 2009, Plaintiff received chest x-rays at the Casa Grande Regional
12 Medical Center ("CGRMC"). *Id.* at 473. No acute abnormality was identified. *Id.* On July
13 5, 2009, Plaintiff was seen in the CGRMC Emergency Department ("ED") complaining of
14 back pain. *Id.* at 412. He was intoxicated during that visit. *Id.* at 413. Plaintiff was
15 diagnosed with lumbar and thoracic strain and peripheral edema in his feet. AR at 413.
16 Accordingly, he was given a prescription for ibuprofen, educational materials regarding back
17 sprain, and discharged. *Id.* On July 26, 2009, Plaintiff was again seen in the CGRMC ED
18 complaining of right leg pain after falling off his bicycle the previous evening. *Id.* at 417.
19 X-rays were taken of his right tibia and fibula, and no evidence of fractures or dislocations,
20 or soft tissue swelling was found. *Id.* at 475. A real-time ultrasound was also performed,
21 showing no evidence of deep venous thrombosis. *Id.* at 477. Plaintiff was diagnosed with
22 a right leg contusion, given prescriptions for Tegretol (for his bipolar disorder) and Percocet,
23 and discharged. AR at 418. On July 28, 2009, Plaintiff was seen in the CGRMC ED for
24 intoxication. *Id.* at 419. A CT scan of Plaintiff's head was performed, and "a large low
25 attenuation within the frontal lobe" was observed. *Id.* at 466. Plaintiff was observed in the
26 ED until he was sober enough for discharge. *Id.* at 419-25. On August 6, 2009, Plaintiff was
27 again seen in the CGRMC ED complaining of a right knee injury and right sided chest and
28

1  rib pain. *Id.* at 427. A chest x-ray was performed, and found to be unremarkable. AR at
2  468. An x-ray of Plaintiff's right knee was also performed, with no abnormalities shown.
3  *Id.* at 472. Plaintiff was diagnosed with a knee sprain, given a prescription for Naproxen, and
4  discharged. *Id.* at 429. In the middle of the night of August 6-7, 2009, Plaintiff was seen in
5  the CGRMC ED with a left thumb injury after hitting someone. *Id.* at 430. He is noted as
6  drinking beer daily, and smelled of alcohol. *Id.* at 431. Plaintiff no longer had the knee
7  immobilizer given the previous evening. AR at 431. An x-ray of Plaintiff's left hand was
8  performed. *Id.* at 470. Plaintiff was diagnosed with a closed fracture of the finger, placed
9  in a thumb sprint, given Naproxen, and discharged. *Id.* On August 10, 2009, Plaintiff
10 returned to CGRMC stating that his bag with the splint, Naproxen and Albuterol were stolen.
11 *Id.* at 433-35. Plaintiff was given new prescriptions, a new splint, and discharged. *Id.* at 437.
12 On August 20, 2009, Plaintiff appeared at the CGRMC ED with alcohol intoxication. *Id.* at
13 438. Plaintiff was discharged. AR at 439. On August 22, 2009, Plaintiff was again seen in
14 the CGRMC ED, intoxicated (using both alcohol and marijuana) and having suicidal
15 ideation. *Id.* at 440. Plaintiff was kept overnight and evaluated by Horizons and cleared.
16 *Id.* at 440-45. On August 31, 2009, Plaintiff was seen in the CGRMC ED, again having
17 suicidal ideation. *Id.* at 446. Plaintiff ran out, and police were called. *Id.* at 447. On
18 September 1, 2009, Plaintiff was seen at the CGRMC ED, intoxicated and having suicidal
19 ideation. AR at 448. Plaintiff was medicated with Ativan and Haldol. *Id.* at 452-53.
20 Plaintiff was again evaluated by Horizons and cleared for discharge. *Id.* at 457. On
21 September 23, 2009, Plaintiff was evaluated at Horizon Human Services. *Id.* at 315, 500-05.
22 Horizon records indicate that after his release from prison, he violated his probation and was
23 incarcerated for another seven (7) months. *Id.* Horizon records confirm Plaintiff's bipolar
24 and ADHD diagnoses. *Id.* at 319. On September 28, 2009, Plaintiff was seen at the CGRMC
25 ED after being found unresponsive on the sidewalk. AR at 458. Plaintiff was diagnosed with
26 acute alcohol intoxication and left the ED before being discharged. *Id.* at 460. On October
27 1, 2009, Plaintiff was again seen at the CGRMC ED having been found on the side of the
28

1 road, intoxicated and "passed out." *Id.* at 462-64.

2       On October 6, 2009, Plaintiff was admitted on an involuntary petition to Sonora
3 Behavioral Health Hospital. *Id.* at 479. Plaintiff's admitting diagnosis was bipolar disorder
4 not otherwise specified, alcohol dependence, alcohol withdrawal, and ADHD. *Id.* at 482.
5 Plaintiff's diagnosis upon discharge was identical, with the addition of cannabis abuse. AR
6 at 493.

7       Pursuant to a request by the Commissioner, Martha A. Goodrich, M.D. performed a
8 case analysis. *Id.* at 520. Dr. Goodrich reviewed the medical records regarding Plaintiff's
9 right knee strain and thumb fracture. *Id.* Dr. Goodrich noted that "[b]ased on the 10/01/2009
10 physical exam, both of these conditions had healed." *Id.* Accordingly, Dr. Goodrich found
11 no somatic medically determinable impairment. *Id.*

12       On January 26, 2010, Plaintiff was taken to Tempe St. Luke's Medical Center by EMS
13 due to alcohol intoxication. AR at 591-98. Plaintiff left before being evaluated and against
14 medical advice. *Id.* at 591-98. On April 8, 2010, Plaintiff sought assistance at Valle del Sol.
15 *Id.* at 525-68. On April 28, 2010, Plaintiff was taken to Tempe St. Luke's Hospital by EMS.
16 *Id.* at 569-89. Plaintiff "was found lying on the ground, intoxicated, combative, and
17 beligerent [sic]." *Id.* at 576. "While at ED, [Plaintiff] was making threats to harm anyone
18 in his sight[.]" AR at 576. A noncontrast CT of Plaintiff's head was performed. *Id.* at 587.
19 Areas of encephalomalacia were found, but no acute abnormality. *Id.* Plaintiff was
20 discharged and directed to follow-up at Valle del Sol. *Id.* at 581.

21       On November 2, 2010, Plaintiff began treatment at La Frontera Center. *Id.* at 650.
22 He was given assistance to obtain a dental appointment and appointments with Patty Kane,
23 M.D. for his psychiatric evaluation and with the shelter worker. AR at 650. On November
24 3, 2010, Dr. Kane met with Plaintiff for his psychiatric evaluation. *Id.* at 652. Plaintiff was
25 diagnosed with Bipolar II disorder, anxiety disorder not otherwise specified and
26 polysubstance dependence. *Id.* at 605. On November 4, 2010, Plaintiff met with Lydia
27 Reynolds, who spoke with Plaintiff's probation officer and noted compliance with shelter

28
- 7 -

rules and conditions of parole. *Id.* at 658. Plaintiff refused to wait for his medications, and left without them. *Id.* at 751. Plaintiff returned later the same day to pick up his medication. AR at 753. On November 8, 2010, Plaintiff was late for accompaniment to court hearings. *Id.* at 747. On November 9, 2010, Plaintiff met with Ms. Reynolds, and explained that he had been evicted from the shelter because of alcohol use. *Id.* at 660, 747. On November 11, 2010, Plaintiff met with Ms. Reynolds. *Id.* at 662. Plaintiff had missed many doses of his medication, apparently while in Pima County Jail after receiving a ticket for third degree criminal trespassing. *Id.* at 662, 755. On November 11, 2010, Plaintiff was also seen at El Rio Community Health Center ("ERCHC") for tooth pain and asthma. AR at 635, 749. Plaintiff was diagnosed with a cavity, asthma, and a black eye. *Id.* at 637. Plaintiff was told to expedite his meeting with the dentist and ice his black eye. *Id.* On November 12, 2010, Plaintiff again met with Ms. Reynolds confirming that he had followed up with El Rio for medical care. *Id.* at 664. On November 15, 2010, Ms Reynolds received a call from Plaintiff stating that he was in the UPH/Kino campus having been petitioned in as a danger to himself. *Id.* at 666. Plaintiff was intoxicated and made statements about killing himself, resulting in the involuntary commitment to Kino. AR at 666. On November 16, 2010, Ms. Reynolds noted that Plaintiff's petition was dropped, and he was instructed to go to the Gospel Rescue Mission upon discharge. *Id.* at 668. On November 17, 2010, Dr. Kane provided treatment and noted that Plaintiff had been kicked out of the Salvation Army because of alcohol use. *Id.* at 606, 654. Plaintiff's medications included Tegretol and Neurontin. *Id.* at 605, 653. On November 18, 2010, Plaintiff met with Sharon Francis, RN, and stated that "he has tried to work 'day labor' but made multiple excuses about why he cannot do this." *Id.* at 759. On November 24, 2010, Ms. Reynolds saw Plaintiff for an interview assessment. *Id.* at 671. Plaintiff provided Ms. Reynolds with his life history. *Id.* Plaintiff also picked up his weekly medication. AR at 762.

  On December 1, 2010, Dr. Kane saw Plaintiff and noted that some of his history, as he reported it, seemed questionable. *Id.* at 609, 656, 672. Dr. Kane further noted continued

- 8 -

1 improvement in Plaintiff's mood stability and the effectiveness of his current medications.
2 *Id.* The same day, Nurse Francis followed up with Community Partnership of Southern
3 Arizona and discovered that there was no record of a serious mental illness determination
4 having been filed for Plaintiff. *Id.* at 764. On December 2, 2010, Plaintiff met with Ms.
5 Reynolds, who encouraged him to attend recovery meetings. *Id.* at 677. Plaintiff also picked
6 up his medication and told Nurse Francis that "he helped a man with some drywall work
7 yesterday and made some money[.]" AR at 765. On December 7, 2010, Plaintiff again met
8 with Ms. Reynolds who reminded him of his legal responsibilities, including court times. *Id.*
9 at 679. On December 9, 2010, Plaintiff met with Ms. Reynolds, and discussed his legal
10 issues and she again encouraged him to attend recovery meetings. *Id.* at 681. Plaintiff left
11 before seeing the nurse for his medication. *Id.* at 767. On December 10, 2010, Plaintiff met
12 with Ms. Reynolds and received his pre-packaged medications that he had forgotten the day
13 before. *Id.* at 683. On December 10, 2010, Plaintiff was also seen at ERCHC for hand pain
14 and numbness, psyche and back pain. AR at 632. Plaintiff's diagnosis included suspected
15 carpal tunnel syndrome, bipolar, seizure disorder, asthma, and low back pain. *Id.* at 634. On
16 December 16, 2010, Plaintiff met with Ms. Reynolds and they discussed why he had missed
17 his medical appointment – Plaintiff had been involved in a physical altercation. *Id.* at 685.
18 Plaintiff received his medication, noting that he had been punched in the left eye. *Id.* at 769.
19 On December 20, 2010, Plaintiff met with Nurse Francis and informed him that he had been
20 incarcerated, and was not returned his medication upon release. *Id.* at 772. On December
21 23, 2010, Plaintiff met with Ms. Reynolds who spoke with him about his "countless
22 interactions with law enforcement and encouragement with keeping from illegal activity[.]"
23 AR at 687. On December 30, 2010, Plaintiff met with Ms. Reynolds who reminded him of
24 his appointment with Dr. Kane, and put him on the day program list for Sonora House. *Id.*
25 at 689. Plaintiff also received his weekly medication. *Id.* at 776.
26       On January 3, 2011, Plaintiff met with Nurse Francis and reported that his AHCCCS
27 had been suspended due to incarceration. *Id.* at 778. On January 5, 2011, Dr. Kane notes

that Plaintiff last drank on New Years Eve. *Id.* at 612, 675. Plaintiff was also "incarcerated overnight in jail for crossing the railroad tracks and been given 25 hours of community service." AR at 612, 675. On January 6, 2011, Plaintiff met with Ms. Reynolds and discussed how his legal involvement is "usually tied to him being intoxicated and encouraged him with acudetox and AA [meetings.]" *Id.* at 691. Plaintiff sought to pick up his medication before the pharmacy was open and stated that he would return, which he did. *Id.* at 780, 784. On January 13, 2011, Plaintiff met with Ms. Reynolds and received some individual counseling regarding relationships. *Id.* at 693. Plaintiff also received his weekly medication. *Id.* at 786. On January 18, 2011, Plaintiff met with Ms. Reynolds and wanted to close his services and go to Casa Grande. AR at 695. Plaintiff left the meeting abruptly. *Id.* On January 19, 2011, Dr. Kane met with Plaintiff and reviewed his labs. *Id.* at 696-97. On January 21, 2011, Plaintiff met with Ms. Reynolds, received his pre-packaged medication and told her that his wallet had been stolen, then found later minus his monthly bus pass and fifteen (15) dollars. *Id.* at 701. On January 27, 2011, Plaintiff met with Ms. Reynolds and discussed how he was doing replacing identification after the loss of his wallet, as well as his legal obligations. AR at 703. Plaintiff also met with Nurse Francis to pick-up his weekly medication. AR at 790.

On February 2, 2011, Dr. Kane met with Plaintiff, noting that the increase in Neurontin was very helpful. *Id.* at 699. Dr. Kane also noted that Plaintiff "does occasional labor work[,]" and that "[h]e says he is 'laying off alcohol[.]'" *Id.* Nurse Francis also reached out to El Rio Dental Clinic to try and get Plaintiff a referral to an oral surgeon. *Id.* at 792. On February 3, 2011, Plaintiff met with Ms. Reynolds for assistance preparing for a court appearance the same day, as well as reinstatement with AHCCCS and possibly a shelter. *Id.* at 705. Plaintiff also met with Nurse Francis to pick up his weekly medication. *Id.* at 794. On February 9, 2011, Plaintiff met with Nurse Francis because "the cops took my medication when I was arrested on Sunday[.]" AR at 796. He was given enough to last until the following day. *Id.* On February 10, 2011, Plaintiff returned to pick up his weekly

- 10 -

1 medication, and appropriately filled his own medication box. *Id.* at 798. On February 11, 2 2011, Plaintiff met with Ms. Reynolds and discussed his stay at Sonora House and ongoing 3 legal issues. *Id.* at 707. On February 17, 2011, Plaintiff filled his own seven (7) day 4 medication box, and discussed ongoing issues at Sonora House with Nurse Francis. *Id.* at 5 799. On February 24, 2011, Plaintiff filled his own medication box, and discussed with 6 Nurse Francis his ongoing alcohol abuse and issues at Sonora House. AR at 802. Nurse 7 Francis noted that she and Ms. Reynolds suspected that Plaintiff was dealing drugs. *Id.*

8 On March 3, 2011, Plaintiff saw Ms. Reynolds, and presented with physical injuries 9 obtained while drunk. *Id.* at 709. Plaintiff filled his own seven (7) day medication box. *Id.* 10 at 804. On March 7, 2011, Plaintiff was seen at ERCHC for bilateral knee pain. *Id.* at 628. 11 Plaintiff alleged that he had been beaten up by the police. AR at 628-29. X-rays were 12 ordered. *Id.* at 630. On March 9, 2011, Dr. Kane saw Plaintiff, who had been permanently 13 discharged from Sonora House due to drinking and belligerent behavior. *Id.* at 615, 711. On 14 March 10, 2011, Plaintiff filled his own seven (7) day medication box and discussed his 15 alcohol dependence with Nurse Francis; however, Plaintiff "is resistant to addressing it at this 16 time." *Id.* at 805. On March 17, 2011, Plaintiff met with Ms. Reynolds and they discussed 17 his ongoing legal issues. *Id.* at 712. Plaintiff packed his own seven (7) day medication box, 18 and Nurse Francis noted Plaintiff "[c]ontinues to minimize the effects of [his alcohol] use[.]" 19 AR at 807. On March 21, 2011, Plaintiff met with Ms. Reynolds, and informed him that he 20 had been cited for disorderly conduct as a result of his intoxication. *Id.* at 714. Ms. 21 Reynolds noted that "[h]e continues with legal involvement, but not taking any responsibility 22 for his citation." *Id.* at 715. On March 24, 2011, Plaintiff filled his own seven (7) day 23 medication box, and told Nurse Francis "that he will clean a liquor store parking lot this 24 [morning.]" *Id.* at 811. On March 25, 2011, Plaintiff met with Ms. Reynolds and discussed 25 a possible appointment to obtain a knee brace. *Id.* at 716. Plaintiff also "talked about the 26 yard work that he had just completed and looked happy and proud of his accomplishment." 27 AR at 716. Plaintiff "continues sleeping outdoors after being evicted from housing/shelter 28

1  options." *Id.* On March 29, 2013, Plaintiff met with Ms. Reynolds and discussed the cost
2  for a knee brace. *Id.* at 718. Ms. Reynolds "encouraged him to save [money] he makes on
3  day labor, but [Plaintiff] was against that." *Id.* On March 31, 2011, Plaintiff filled his own
4  seven (7) day medication box, and asked for a refill of his Albuterol inhaler. *Id.* at 813.

5        On April 1, 2011, Plaintiff met with Nurse Francis and packed his own seven (7) day
6  medication supply. AR at 817. Plaintiff stated that he had been "jumped" at a park and his
7  medication stolen, and admitted that he had been drinking prior to this happening. *Id.* On
8  April 4, 2011, Plaintiff brought Nurse Francis a receipt for his inhaler and "stated that he
9  went to jail on Saturday night for 'disorderly conduct.'" *Id.* at 819. Plaintiff stated that he
10 continues to drink almost daily. *Id.* On April 6, 2011, Dr. Kane noted that Plaintiff's case
11 manager reports that he continues "to be arrested almost weekly related to alcohol abuse."
12 *Id.* at 618, 721. Plaintiff was intoxicated at the meeting with Dr. Kane. *Id.* Plaintiff was
13 charged with disorderly conduct related to an outburst at a hospital, and was arrested this
14 weekend. AR at 618, 721. On April 7, 2011, Plaintiff met with Ms. Reynolds, and they
15 discussed increasing his participation in substance abuse treatment for his abuse of alcohol.
16 *Id.* at 722. Plaintiff packed his own seven (7) day medication box, and Nurse Francis
17 reported that he "is able to recognize his symptoms of depression [are] a trigger for [alcohol]
18 use." *Id.* at 821. On April 11, 2011, Plaintiff met with Ms. Reynolds, and reported that he
19 did not drink or get arrested the previous weekend. *Id.* at 724. On April 14, 2011, Plaintiff
20 met with Ms. Reynolds and discussed his efforts to decrease alcohol consumption. *Id.* at 726.
21 On April 21, 2011, Plaintiff met with Ms. Reynolds, and informed her of a citation for
22 smoking marijuana in front of the downtown library. AR at 729. On April 21, 2011,
23 Plaintiff filled a seven (7) day medication box, and reported to Nurse Francis that he had
24 missed two (2) days of medication the previous week. *Id.* at 823, 826. On April 26, 2011,
25 Plaintiff failed to meet with Ms. Reynolds because he was "'too busy' with work and not
26 being able to walk to [La Frontera]." *Id.* at 731. On April 28, 2011, Plaintiff met with Ms.
27 Reynolds and discussed community homeless resources and his ongoing legal issues. *Id.* at
28

- 12 -

1    733. Plaintiff also received his weekly medication. AR at 828.

2    On May 3, 2011, Plaintiff met with Ms. Reynolds, who assisted him with his ongoing
3    legal issues. *Id.* at 735. On May 4, 2011, Plaintiff reported to Dr. Kane that he is avoiding
4    hard liquor, but drinking beer a few times a week. *Id.* at 621, 737. Dr. Kane filled out a
5    Mental Residual Functional Capacity Questionnaire regarding Plaintiff, and diagnosed
6    Bipolar II disorder, anxiety disorder not otherwise specified, and a neurological disorder. *Id.*
7    at 623. Dr. Kane's "[f]indings include impaired memory and cognition, poor attention span,
8    mood lability, impulsivity, very poor interpersonal skills, frequently poor hygiene." *Id.* Dr.
9    Kane reports that Plaintiff is unable to meet competitive standards with regard to most mental
10   abilities and aptitudes needed to do unskilled work; however, Plaintiff is seriously limited,
11   but not precluded with regard to asking simple questions or requesting assistance. AR at 625.
12   Dr. Kane further reported that Plaintiff is unable to meet competitive standards with regard
13   to mental abilities and aptitudes needed to do semiskilled and skilled work. *Id.* at 626. Dr.
14   Kane also found that Plaintiff is unable to meet competitive standards interacting
15   appropriately with the general public and maintaining socially appropriate behavior. *Id.* He
16   is seriously limited but not precluded from adherence to basic standards of neatness and
17   cleanliness and traveling in unfamiliar places. *Id.* Plaintiff is limited but can satisfactorily
18   use public transportation. *Id.* Dr. Kane found that Plaintiff's persistent functional limitations
19   related to his psychiatric diagnosis are irregardless of his alcohol use. AR at 627. On May
20   5, 2011, Plaintiff met with Ms. Reynolds and discussed his need to minimize his legal
21   involvement and decrease his alcohol abuse. *Id.* at 740. Plaintiff filled his own seven (7) day
22   medication box, and requested a refill for his inhaler. *Id.* at 830. On May 12, 2011, Plaintiff
23   packed his own seven (7) day medication box, and stated that he is continuing to cut down
24   on his alcohol abuse. *Id.* at 832. On May 19, 2011, Plaintiff met with Ms. Reynolds and
25   discussed his alcohol abuse, legal involvement and engagement with recovery meetings. *Id.*
26   at 742. Plaintiff also packed his own seven (7) day medication box. AR at 834. On March
27   18, 2011, Plaintiff received Acu-Detox acupuncture treatment. *Id.* at 744-46.

28
- 13 -

1  On May 25, 2011, Plaintiff stated that he "is 'very upset over [his] brother dying.'"
2  *Id.* at 836. Plaintiff further told Nurse Francis that "he plans to go get drunk and stated he
3  was ticketed yesterday for 'an open container' on 4th Avenue – stated he has been using
4  [alcohol] all week." *Id.* On May 26, 2011, Nurse Francis was informed that Plaintiff was
5  incarcerated at Pima County Jail. *Id.* at 838. On June 4, 2011, Plaintiff met with Nurse
6  Francis and packed a two (2) day medication box. *Id.* at 840.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

. . .

. . .

- 14 -

## III. ANALYSIS

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff was not engaged in substantial gainful activity since November 1, 2010. AR at 22. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: status post bilateral knee injuries, bipolar disorder, attention deficit hyperactivity disorder (ADHD), and alcohol dependence (20 CFR 416.920(c))." *Id.* At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that met or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.920(d))." *Id.* at 23. The ALJ found that Plaintiff "[a]fter careful consideration of the entire record, . . . based on all of the impairments, including the substance use disorders, the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that he is unable to sustain even simple work activities on a regular and continuing basis." *Id.* at 24. At step four, the ALJ determined that Plaintiff "is unable to perform past relevant work while he is abusing alcohol." *Id.* at 28. The ALJ also found that "[i]f the claimant stopped the substance use, the claimant would have the residual functional capacity

- 15 -

1  to perform medium work as defined in 20 CFR 416.967(c) except the claimant is limited to
2  understanding, remembering and carrying out simple one or two step instructions; he can
3  relate and interact with supervisors and coworkers; he should have limited contact with the
4  public; he can maintain concentration and attention for simple repetitive work; he can tolerate
5  job related stress in low and moderate stress situations." *Id.* at 30.  At step five, the ALJ
6  found that "[i]f the claimant stopped the substance use, the claimant would be able to perform
7  past relevant work as landscape laborer/weeder.  This work does not require the performance
8  of work-related activities precluded by the residual functional capacity the claimant would
9  have if he stopped the substance use (20 CFR 416.965)." *Id.* at 32.  Ultimately, the ALJ
10 determined that "[b]ecause the claimant would not be disabled if he stopped the substance
11 use (20 CFR 416.920(f)), the claimant's substance use disorder is a contributing factor
12 material to the determination of disability (20 CFR 416.935).  Thus, the claimant has not
13 been disabled within the meaning of the Social Security Act[.]" *Id.* at 33.  Plaintiff asserts
14 that the ALJ erred in rejecting "the uncontroverted opinion of treating psychiatrist Patty
15 Kane, M.D. that the Plaintiff's alcohol abuse was not a material factor contributing to his
16 disability[.]"  Pl.'s Opening Brief (Doc. 21) at 4.

17      ### *A.     Treating Physician Opinions*

18       "As a general rule, more weight should be given to the opinion of a treating source
19 than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821,
20 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)).  "The
21 opinion of a treating physician is given deference because 'he is employed to cure and has
22 a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r*
23 *of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226,
24 1230 (9th Cir. 1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating
25 physician, even if it is contradicted by the opinions of other doctors, without providing
26 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins*
27 *v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725

28

(9th Cir. 1998)); *See also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).

### 1.     Plaintiff's Credibility

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 204 F.3d 1028, 1035-36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *See also Lingenfelter*, 504 F.3d at 1036. Further, "the claimant need not show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and

- 17 -

'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

Here, the ALJ determined that "[i]f the claimant stopped the substance abuse . . . the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." AR at 31. As such, Plaintiff has met the first step. *See Smolen*, 80 F.3d at 1281-82. The ALJ further found that:

> In terms of the claimant's alleged inability to get along with people, records confirm the claimant is easily agitated, argumentative and sometimes physically violent when he is under the influence. However, on those times when he was sober, he was noted to be only mildly irritable. While the claimant appears to have little insight into his difficulties, records clearly show he is able to interact with others in a superficial manner when he is sober.

AR at 31. The ALJ also considered that Plaintiff's "allegations of disabling pain are out of proportion with the record." *Id.*; *see also* AR at 765. Plaintiff has minimal treatment for his complaints of knee and hand pain, and the x-rays "show no evidence of arthritis or joint narrowing." *Id.*; *see also* AR at 429, 470, 472. Furthermore, Plaintiff "does not use narcotic pain relievers or a cane to ambulate." *Id.* "Additionally, the claimant testified that he collects cans for spending money. [Further,] [m]edical records show he also works as a laborer for extra money." AR at 31; *see also* AR at 699, 716, 765. Plaintiff "was also able to complete community service in a soup kitchen, which is also work-like activity[,]" suggesting that his daily activities have "been somewhat greater than [he] has generally reported." *Id.* at 31-32. Upon reviewing the record as a whole, this Court concludes that the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's testimony.

### 2. Dr. Kane's Opinion

Regarding treating physician Dr. Kane's opinion, the ALJ stated in relevant part:

> As for the opinion evidence, the undersigned gives no weight to Dr. Kane's opinion that the claimant's drinking does not contribute to his disability

- 18 -

> (Exhibit 23F). A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance; and when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight (SSR 96-2p). However, Dr. Kane's opinion conflicts with the substantial evidence of record, documenting a marked decrease in the claimant's functioning when he drinks (SSR 96-6p). In fact, her opinion conflicts with her own treatment notes, where she observed that the claimant continued to drink, was being arrested weekly due to drunken altercations, and was unable to access shelter due to alcohol use (Exhibit 25F/72). Dr. Kane apparently relied quite heavily on the subjective report of the claimant, who said his symptoms continued during his sobriety in prison. She appears to have uncritically accepted as true most, if not all, of what the claimant reported despite not having accessed his prison records. Yet, as explained above, there exist good reasons for questioning the reliability of the claimant's subjective complaints.

AR at 32. After reviewing the record, the Court agrees with the ALJ that Dr. Kane's Questionnaire response regarding the impact of Plaintiff's alcohol abuse is not consistent with the medical records in this case. As the ALJ found, and the records demonstrate, there is a high degree of correlation between Plaintiff's alcohol abuse and his impaired functioning. *See id.* at 412-25, 427, 430-31, 438-40, 458, 462-64, 468, 473, 569-89, 591-98, 612, 615, 618, 628-30, 660, 662, 675, 685, 709, 711, 721, 747, 755, 769, 778, 796, 802, 817, 836-38. The Court finds that the ALJ's adverse credibility finding regarding Plaintiff, as well as her detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation and making findings, supports a rejection of Dr. Kane's determination that alcohol abuse does not contribute to Plaintiff's disability. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 ("The ALJ can meet [the burden for rejecting a treating physician's opinion] by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings." *Id.* (citations omitted)).

## IV.   CONCLUSION

In light of the foregoing, the Court affirms the Commissioner's decision.

Accordingly, IT IS HEREBY ORDERED that:

1)   Carolyn W. Colvin, Acting Commissioner of Social Security, is **substituted**

**as Respondent** for Michael Astrue pursuant to Rule 25(d) of the Federal Rules of Civil Procedure;

2)   Plaintiff's Opening Brief (Doc. 21) is DENIED;

3)   The Commissioner's decision is AFFIRMED;

4)   Plaintiff's Motion to Withdraw as Attorney of Record and Preliminary Notice of Substitution of Counsel (Doc. 28) is GRANTED;

5)   The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 27th day of September, 2013.

_____
Bruce G. Macdonald
United States Magistrate Judge